J-A29035-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| BRITTANY LEIGH DUFF, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF JULIAN ALEXANDER DUDKIN, A MINOR | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | No. 559 WDA 2024 |
| KEVIN LAZOR, LISA LAZOR, AND OUTER BANKS BLUE, LLC | : : : : : | |
| v. | : : : | |
| JOSEPH KOZLINA, KATHY KOZLINA, JENNA HALENDA, JOHN DOES I-IV, AND JANE DOES I-IV | : : : : : | |
| APPEAL OF: OUTER BANKS BLUE, LLC | : : : | |

Appeal from the Order Entered March 8, 2024
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-21-008622

BEFORE: OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: AUGUST 12, 2025**

Appellant, Outer Banks Blue, LLC ("OBB"), appeals from the trial court's order overruling its preliminary objections for lack of personal jurisdiction and improper venue. After careful review, we affirm.

On November 22, 2021, Appellee, Brittany Leigh Duff, individually and as administrator of the estate of Julian Alexander Dudkin, a minor, filed a

complaint against OBB and Appellees, Kevin Lazor and Lisa Lazor, in the Court of Common Pleas of Allegheny County. In the complaint, *inter alia*, Ms. Duff alleged that, on July 28, 2019, Julian — her six-year-old son — drowned in a swimming pool located on a private residential property (the "Premises") that her family had rented in Dare County, North Carolina. *See* Complaint, 11/22/21, at ¶¶ 2-3, 18, 20. Ms. Duff averred that the Lazors, as husband and wife, were the fee simple owners of the Premises at all relevant times and rented out the Premises to beach vacationers for short-term vacation rentals. *Id.* at ¶¶ 11, 15. According to Ms. Duff, the Lazors reside in Allegheny County, Pennsylvania, and the Premises is a vacation home for them. *Id.* at ¶¶ 9, 12. She also claimed that OBB served as the rental agent and property manager for the Premises on behalf of the Lazors, and that OBB's registered office and principal place of business is in Dare County, North Carolina. *Id.* at ¶¶ 10, 17.

While there was a wooden fence surrounding the swimming pool on the Premises, Ms. Duff said the fence's self-latching gate had a broken latch, such that it could not possibly lock or be latch closed. *See id.* at ¶¶ 22-27. She claimed that the broken latch on the gate allowed Julian to access the swimming pool and was the direct and proximate cause of his injuries and tragic drowning death. *Id.* at ¶ 30. She brought survival and wrongful death claims against OBB and the Lazors based on their purported negligence, negligence *per se*, carelessness, and recklessness. *See id.* at ¶¶ 31-35. Ms.

Duff said she resides in Allegheny County, as did Julian prior to his death. *Id.* at ¶¶ 1-2.

OBB and the Lazors subsequently filed separate preliminary objections to the complaint, asserting lack of personal jurisdiction over OBB, improper venue, and that claims for punitive damages and allegations of recklessness should be stricken.[1] Among other things, OBB argued that Ms. Duff's father, Joseph Kozlina, entered into a Vacation Rental Agreement ("VRA") with OBB, pursuant to which Ms. Duff and her family rented the Premises. *See* OBB's Preliminary Objections, 1/21/22, at ¶ 25.[2] OBB asserted that the VRA includes a forum selection clause, stating that any dispute or action filed relating to the lease shall be instituted and prosecuted in the General Court of Justice in North Carolina and that Dare County shall be the sole venue for such action, thereby rendering venue improper in Allegheny County. *See id.* at ¶¶ 27, 35-36.

Following the filing of the preliminary objections, the trial court ordered the parties to conduct limited discovery and file supplemental briefs on the issue of jurisdiction. The parties each filed supplemental briefs. The trial court then ordered the parties to provide further briefing on the forum selection clause issue. The parties, again, each filed supplemental briefs.

---

[1] In addition to the Lazors' preliminary objection raising improper venue, they also challenged venue based on forum *non conveniens*.

[2] OBB acknowledges that Mr. Kozlina was a Pennsylvania resident at the time he signed the VRA. *See* OBB's Supplemental Brief in Support of its Preliminary Objections, 12/20/23, at 4; *see also* OBB's Brief at 12.

On March 8, 2024, the trial court entered two orders.[3] In the first order, the trial court overruled the preliminary objections of OBB relating to lack of personal jurisdiction, improper venue, and punitive damages. In the second order, it overruled the Lazors' preliminary objections regarding lack of personal jurisdiction, improper venue and forum *non conveniens*, and punitive damages.

On March 18, 2024, OBB filed a "Motion for Reconsideration and Modification of Order Pursuant to 42 Pa.C.S.[] § 5505[,]" and requested that the trial court modify its March 8, 2024 order overruling OBB's preliminary objections to add that "a substantial issue of venue or jurisdiction is presented." OBB's Motion for Reconsideration, 3/18/24, at ¶ 14 (citing Pa.R.A.P. 311(b)(2)).[4, 5] Thereafter, on April 8, 2024, OBB also filed a motion

_____

[3] These orders were filed on March 7, 2024; Pa.R.Civ.P. 236 notice was not given until March 8, 2024. *See* Pa.R.Civ.P. 236(b) (requiring that the prothonotary note in the docket the giving of written notice of the entry of an order); Pa.R.A.P. 108(b) (stating that the date of entry of a civil order "shall be the date on which the clerk makes the notation in the docket that written notice of entry of the order has been given as required by [Rule] 236(b)").

[4] *See also* 42 Pa.C.S. § 5505 ("Except as otherwise provided or prescribed by law, a court upon notice to the parties may modify or rescind any order within 30 days after its entry, notwithstanding the prior termination of any term of court, if no appeal from such order has been taken or allowed."); Pa.R.A.P. 311(b)(2) ("An appeal may be taken as of right from an order in a civil action or proceeding sustaining the venue of the matter or jurisdiction over the person or over real or personal property if … the court states in the order that a substantial issue of venue or jurisdiction is presented.").

[5] Briefly, after OBB filed its motion for reconsideration, OBB filed a complaint to join additional defendants on March 28, 2024. OBB sought to join Mr.
*(Footnote Continued Next Page)*

- 4 -

to amend the trial court's order to permit a certified interlocutory appeal pursuant to 42 Pa.C.S. § 702(b).[6]

On April 12, 2024, the trial court entered two orders.[7] First, the trial court filed an order pertaining to OBB's motion to amend to permit a certified interlocutory appeal pursuant to Section 702(b), in which the trial court stated that its March 8, 2024 order overruling OBB's preliminary objections is modified pursuant to Rule 311(b)(2) to include that a substantial issue of

_____

Kozlina; Kathy Kozlina; Jenna Halenda; and John Does I-IV and Jane Does I-IV (collectively "Additional Defendants"). OBB claimed, *inter alia*, that Additional Defendants were present on the Premises on the day of Julian's drowning, and breached their duty to protect him by not observing him while he was in or near the pool and/or by leaving him in the care of other minors who were not competent to safeguard him. *See* OBB's Complaint to Join Additional Defendants, 3/28/24, at ¶¶ 12-15. In addition to bringing claims against Additional Defendants for sole liability, contribution, and indemnity, as well as for contractual indemnification pursuant to an indemnification-and-hold-harmless provision in the VRA, OBB filed cross-claims against the Lazors and Ms. Duff, in her individual capacity.

The Lazors then filed cross-claims against OBB; Ms. Duff, in her individual capacity; and Additional Defendants. The Lazors also filed a joinder complaint against Additional Defendants. Subsequently, the Kozlinas filed cross-claims against OBB and the Lazors.

[6] *See* 42 Pa.C.S. § 702(b) ("When a court or other government unit, in making an interlocutory order in a matter in which its final order would be within the jurisdiction of an appellate court, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter, it shall so state in such order. The appellate court may thereupon, in its discretion, permit an appeal to be taken from such interlocutory order.").

[7] These orders were filed on April 11, 2024, but Rule 236 notice was not provided until April 12, 2024.

venue or jurisdiction is presented. Second, it issued an order regarding OBB's "Motion for Reconsideration and Modification of Order Pursuant to 42 Pa.C.S.[] § 5505[,]" in which it again stated that its March 8, 2024 order overruling OBB's preliminary objections is modified pursuant to Rule 311(b)(2) to include that a substantial issue of venue or jurisdiction is presented.[8]

---

[8] This order mistakenly said that the Lazors had filed the "Motion for Reconsideration and Modification of Order Pursuant to 42 Pa.C.S.[] § 5505[.]" **See** Order Disposing of Motion for Reconsideration, 4/12/24. A review of the record shows that OBB is the only party to have filed a motion with that name. The Lazors, instead, filed a "Supplemental Brief Joining in Support of [OBB's] Motion for Reconsideration." **See** Lazors' Supplemental Brief in Support, 3/25/24.

Additionally, we recognize that the trial court entered this order more than 30 days after it issued its March 8, 2024 order. However, the 30-day limitation to modify or rescind orders under Section 5505 does not apply to interlocutory orders. **See Key Auto. Equip. Specialists, Inc. v. Abernethy**, 636 A.2d 1126, 1128 (Pa. Super. 1994) ("[Section 5505] which limits the time for reconsideration of orders to 30 days is applicable only to final orders. When considering an interlocutory order, however, the trial court is not bound by the 30[-]day limitation. An order is interlocutory and not final if it does not effectively place the litigant out of court or otherwise end the lawsuit.") (citations omitted); **cf. Gardner v. Consol. Rail Corp.**, 100 A.3d 280, 283 (Pa. Super. 2014) (noting that, with respect to final orders, "either the lapse of 30 days beyond the date of entry of an original order, or the filing of a notice of appeal[,] will vitiate the jurisdiction of the trial court to modify, alter, or otherwise proceed further in the matter") (citation omitted).

On May 8, 2024, OBB filed a timely notice of appeal.[9]  The trial court directed OBB to file a concise statement pursuant to Pa.R.A.P. 1925(b), and OBB timely complied.[10]

_____

[9] The trial court's March 8, 2024 order overruling OBB's preliminary objections became appealable as of right under Rule 311(b)(2) upon entry of the trial court's April 12, 2024 order.  Accordingly, the 30-day appeal period began to run on April 12, 2024, rendering OBB's May 8, 2024 notice of appeal timely. *See Merino v. Repak, B.V.*, 286 A.3d 1249, 1255 (Pa. Super. 2022) (stating appeal period began to run when the trial court docketed its order that amended its prior order to include the requisite language under Rule 311(b)(2)).

[10] Ms. Duff filed an application to quash OBB's appeal on May 28, 2024. Therein, she argued that the trial court's April 12, 2024 order disposing of OBB's motion for reconsideration was a nullity because OBB relied on only Section 5505 in seeking reconsideration and modification of the trial court's order pursuant to Rule 311(b)(2), and the trial court did not rule on OBB's motion within 30 days of its March 8, 2024 order, as required by Section 5505. *See* Application to Quash, 5/28/24, at ¶ 21 ("Because OBB expressly and solely sought relief in the trial court pursuant to Section 5505, OBB has waived disclaimer of the applicability of that [s]ection on appeal, along with any argument that the trial court had the authority to grant its [m]otion on any other grounds.").  On June 28, 2024, this Court entered a *per curiam* order denying Ms. Duff's application to quash without prejudice to her right to again raise the issue in her appellate brief or in a new application that may be filed after the appeal has been assigned to a merits panel.  In Ms. Duff's brief, she represents that she will be filing a new application to quash pursuant to this Court's *per curiam* order.  *See* Ms. Duff's Brief at 5 n.1.  However, the appellate docket does not show that Ms. Duff filed a new application to quash following the submission of her appellate brief, and we received no such filing.

In any event, we would deem meritless the argument raised in Ms. Duff's initial application to quash.  "The appealability of an order directly implicates the jurisdiction of the court asked to review the order…[.]  [S]ince we lack jurisdiction over an unappealable order[,] it is incumbent on us to determine, *sua sponte* when necessary, whether the appeal is taken from an appealable order."  *Siana v. Noah Hill, LLC*, 322 A.3d 269, 275 (Pa. Super. 2024) (citation omitted; some brackets added).  OBB appealed from an

*(Footnote Continued Next Page)*

The trial court subsequently issued its Rule 1925(a) opinion. There, it opined that Pennsylvania had both general and specific personal jurisdiction over OBB. Further, it explained that the VRA's forum selection clause did not apply because Ms. Duff was not a party or a third-party beneficiary to the VRA.

---

appealable order, as the trial court's April 12, 2024 order amending its March 8, 2024 order was not a nullity.

To begin, we have already explained that Section 5505 does not apply to the trial court's March 8, 2024 order, as it was not a final order. *See* notes 4 and 8, *supra* (addressing 42 Pa.C.S. § 5505 and why it does not apply to the trial court's March 8, 2024 order). Moreover, in determining jurisdiction, this Court is not bound by the argument advanced by OBB in its motion for reconsideration. *See Commonwealth v. James*, 69 A.3d 180, 184 (Pa. 2013) (addressing the issue of whether the trial court had jurisdiction to reconsider its order more than 30 days after it was entered and noting that such an issue of jurisdiction may be raised *sua sponte*); *Commonwealth v. Zieglar*, 322 A.3d 256, 261-62 (Pa. Super. 2024) (considering, *sua sponte*, whether the trial court properly granted reconsideration and whether this Court had jurisdiction over the appeal). In addition, trial courts have the inherent power to reconsider their own interlocutory orders. *See Key Auto.*, 636 A.2d at 362 (noting that a trial court "has the inherent power to reconsider its own rulings[,]" and determining that the trial court properly exercised its discretion in *sua sponte* reconsidering its interlocutory order beyond the 30-day period). Thus, the trial court could reconsider and modify its March 8, 2024 order regardless of the argument asserted by OBB in its motion for reconsideration. *See* Order Disposing of Motion for Reconsideration, 4/12/24 (making no reference to Section 5505 in modifying its March 8, 2024 order pursuant to Pa.R.A.P. 311(b)(2), aside from quoting the name of OBB's motion which mentioned Section 5505). Finally, to the extent Ms. Duff says that Section 5505 applies because OBB relied on Section 5505 in its motion for reconsideration, the trial court also stated that the March 8, 2024 order was modified pursuant to Rule 311(b)(2) in its order disposing of OBB's motion to amend to permit a certified interlocutory appeal under Section 702(b). OBB did not raise or rely on Section 5505 in its motion to amend. Accordingly, Ms. Duff's quashal argument is baseless, and we see no reason to quash this appeal.

On appeal, OBB raises the following questions for our review:

1. Whether the trial court erred in overruling [OBB's] [p]reliminary [o]bjection for lack of personal jurisdiction considering the nature and quantity of [OBB's] contacts with Pennsylvania?

2. Whether the trial court erred in overruling [OBB's] [p]reliminary [o]bjection for improper venue because the [VRA] pursuant to which [Julian's] family was staying on the subject property … contains an enforceable forum selection clause that says, "[A]ny dispute or action filed relating to th[e] [VRA] shall be instituted and prosecuted in the General Court of Justice within the State of North Carolina *and the County of Dare shall be the sole venue for such action*," and because the [VRA] binds non-signatories, including [Ms. Duff] and [Julian]?

OBB's Brief at 4-5 (emphasis in original; some brackets added).[11, 12]

## First Issue

*Jurisdiction*

In OBB's first issue, it contends that the trial court erred in overruling its preliminary objection for lack of personal jurisdiction. At the outset,

[o]ur standard of review in an appeal from an order disposing of preliminary objections challenging the exercise of *in personam* jurisdiction is as follows:

When preliminary objections, if sustained, would result in the dismissal of an action, such objections should be sustained only in cases which are clear and free from doubt…. Moreover, when deciding a motion to dismiss for

_____

[11] We have re-ordered OBB's issues to facilitate our review.

[12] The Lazors filed an appellees' brief, in which they adopted OBB's brief and raised two additional points. **See** Lazors' Brief at 6 (raising that Ms. Duff's cause of action against the Lazors is also subject to the forum selection clause in the VRA, and that — if this Court were to reverse the trial court's order and find no jurisdiction over OBB — the case should be dismissed, as OBB is an indispensable party). Ms. Duff also filed an appellee's brief. None of the remaining parties sought to file briefs with this Court.

> lack of personal jurisdiction[,] the court must consider the evidence in the light most favorable to the non-moving party.
>
> This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or an abuse of discretion. Once the moving party supports its objections to personal jurisdiction, the burden of proving personal jurisdiction is upon the party asserting it. Courts must resolve the question of personal jurisdiction based on the circumstances of each particular case.

**N.T. ex rel. K.R.T. v. F.F.**, 118 A.3d 1130, 1134 (Pa. Super. 2015) (cleaned up).

"Regardless of whether general or specific *in personam* jurisdiction is asserted, the propriety of such an exercise must be tested against the Pennsylvania … statute [authorizing jurisdiction] **and** the [D]ue [P]rocess [C]lause of the Fourteenth Amendment." **Haas v. Four Seasons Campground, Inc.**, 952 A.2d 688, 692 (Pa. Super. 2008) (citations omitted; emphasis added). With respect to the Due Process Clause, the United States Supreme Court has explained:

> The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant. The canonical decision in this area remains **International Shoe Co. v. Washington**, 326 U.S. 310 … (1945). There, the Court held that a tribunal's authority depends on the defendant's having such "contacts" with the forum [s]tate that "the maintenance of the suit" is "reasonable, in the context of our federal system of government," and "does not offend traditional notions of fair play and substantial justice." **Id.**[] at 316–[]17 … (internal quotation marks omitted). In giving content to that formulation, the Court has long focused on the nature and extent of "the defendant's relationship to the forum [s]tate." **Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.**, 582 U. S. [255], [262] (2017) (citing cases). That focus led to our recognizing two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked)

jurisdiction. *See Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 … (2011).

A state court may exercise general jurisdiction only when a defendant is "essentially at home" in the [s]tate. *Ibid.* General jurisdiction, as its name implies, extends to "any and all claims" brought against a defendant. *Ibid.* Those claims need not relate to the forum [s]tate or the defendant's activity there; they may concern events and conduct anywhere in the world. But that breadth imposes a correlative limit: Only a select "set of affiliations with a forum" will expose a defendant to such sweeping jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 137 … (2014). In what we have called the "paradigm" case, an individual is subject to general jurisdiction in her place of domicile. *Ibid.* (internal quotation marks omitted). And the "equivalent" forums for a corporation are its place of incorporation and principal place of business. *Ibid.* (internal quotation marks omitted); *see id.*[] at 139 … n.19 (leaving open "the possibility that in an exceptional case" a corporation might also be "at home" elsewhere). …

Specific jurisdiction is different: It covers defendants less intimately connected with a [s]tate, but only as to a narrower class of claims. The contacts needed for this kind of jurisdiction often go by the name "purposeful availment." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 … (1985). The defendant, we have said, must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum [s]tate." *Hanson v. Denckla*, 357 U.S. 235, 253 … (1958). The contacts must be the defendant's own choice and not "random, isolated, or fortuitous." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 … (1984). They must show that the defendant deliberately "reached out beyond" its home—by, for example, "exploi[ting] a market" in the forum [s]tate or entering a contractual relationship centered there. *Walden v. Fiore*, 571 U.S. 277, 285 … (2014) (internal quotation marks and alterations omitted). Yet even then—because the defendant is not "at home"—the forum [s]tate may exercise jurisdiction in only certain cases. The plaintiff's claims, we have often stated, "must arise out of or relate to the defendant's contacts" with the forum. *Bristol-Myers*, 582 U.S.[] at [262] (quoting *Daimler*, 571 U.S.[] at 127…; alterations omitted); *see, e.g.*, *Burger King*, 471 U.S.[] at 472…; *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 … (1984); *International Shoe*, 326 U.S.[] at 319…. Or put just a bit differently, "there must be 'an affiliation between the forum and the underlying controversy,

principally, [an] activity or an occurrence that takes place in the forum [s]tate and is therefore subject to the [s]tate's regulation.'" ***Bristol-Myers***, 582 U.S.[] at [262] (quoting ***Goodyear***, 564 U.S.[] at 919[]).

These rules derive from and reflect two sets of values—treating defendants fairly and protecting "interstate federalism." ***World-Wide Volkswagen Corp. v. Woodson***, 444 U.S. 286, 293 … (1980); ***see id.***[] at 297−[]98…. Our decision in ***International Shoe*** founded specific jurisdiction on an idea of reciprocity between a defendant and a [s]tate: When (but only when) a company "exercises the privilege of conducting activities within a state"—thus "enjoy[ing] the benefits and protection of [its] laws"—the [s]tate may hold the company to account for related misconduct. [***International Shoe***,] 326 U.S.[] at 319…; ***see Burger King***, 471 U.S.[] at 475−[]76…. Later decisions have added that our doctrine similarly provides defendants with "fair warning"—knowledge that "a particular activity may subject [it] to the jurisdiction of a foreign sovereign." ***Id.***[] at 472 … (internal quotation marks omitted); ***World-Wide Volkswagen***, 444 U.S.[] at 297 … (likewise referring to "clear notice"). A defendant can thus "structure [its] primary conduct" to lessen or avoid exposure to a given [s]tate's courts. ***Id.***[] at 297…. And this Court has considered alongside defendants' interests those of the [s]tates in relation to each other. One [s]tate's "sovereign power to try" a suit, we have recognized, may prevent "sister [s]tates" from exercising their like authority. ***Id.***[] at 293…. The law of specific jurisdiction thus seeks to ensure that [s]tates with "little legitimate interest" in a suit do not encroach on [s]tates more affected by the controversy. ***Bristol-Myers***, 582 U. S.[] at [263].

***Ford Motor Co. v. Montana Eighth Judicial Dist. Court***, 592 U.S. 351, 358-60 (2021) (some brackets added; footnote omitted).

### General Jurisdiction

We begin by assessing whether Pennsylvania may exercise general jurisdiction over OBB. In Pennsylvania, general jurisdiction is governed by 42 Pa.C.S. § 5301. Here, in asserting that Pennsylvania has general jurisdiction over OBB, both the trial court and Ms. Duff rely on Section 5301(a)(2)(iii),

which permits general jurisdiction over a corporation based on its "carrying on of a continuous and systematic part of its general business within this Commonwealth." 42 Pa.C.S. § 5301(a)(2)(iii). **See also** Trial Court Opinion ("TCO"), 8/1/24, at 7, 9-10; Ms. Duff's Brief at 43. When jurisdiction over a defendant is based upon Section 5301(a), "any cause of action may be asserted against him…." 42 Pa.C.S. § 5301(b). However, the propriety of exercising such jurisdiction under Pennsylvania's statute must also be tested against the Fourteenth Amendment's Due Process Clause, as discussed *supra*. **Mendel v. Williams**, 53 A.3d 810, 818 (Pa. Super. 2012) (citation omitted); **Haas**, **supra**; **see also Ford**, **supra**.

Here, in determining Pennsylvania has general jurisdiction over OBB, the trial court explained:

> OBB purposefully directs its activities towards Pennsylvania, its contacts with Pennsylvania are continuous and systematic, and for all practical purposes [OBB] conducts business in Pennsylvania. OBB argues that Pennsylvania does not have general jurisdiction because OBB is not a resident of, does not advertise, has no offices or employees, [and] has never paid taxes, owned property, or maintained bank accounts in Pennsylvania. However, Pennsylvania courts have also established a "sliding scale" test of jurisdiction based largely on the degree and type of interactivity if a website is involved. **Efford**[ **v. Jockey Club**], 796 A.2d [370,] 373-74[ (Pa. Super. 2002)]. [P]ersonal jurisdiction is more greatly exercised when it is directly proportionate to the nature and quality of commercial activity that the entity conducts over the Internet. **Zippo Mfg. Co.**[ **v. Zippo Dot Com, Inc.**], 952 F.Supp. [1119,] 1124[ (W.D.Pa. 1997)]. Where a defendant clearly does business over the Internet by entering into contracts with non-residents [*sic*] of the forum state that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. **Id.** Timothy Cafferty, the managing member of OBB, admitted in his deposition on

- 13 -

October 9, 2023[,] that OBB's website was interactive and seventy percent (70%) of its bookings were derived from its website. Furthermore, customers and renters signed its leases and made payments utilizing its interactive website. [Mr.] Cafferty also admitted that OBB's website operates to solicit business and acts as a conduit for prospective renters to consummate rental transactions with OBB and the use of the interactive website was the most effective way of doing business. []*See*[] T. Cafferty Depo.[, 10/9/23, at] 95-99….[13]

Further, [Mr.] Cafferty testified that OBB's interactive website also contained a homeowner's portal which allowed the homeowner to monitor bookings, place work orders for their properties, and offered webinars that advertised additional services they could purchase for their property. OBB also emailed a monthly newsletter to the Lazors and all other property owners that included advertisements for additional services not provided in the standard rental management agreement, and quarterly webinars for them to participate in or view later vis-[à]-vis the interactive website. The purpose of the webinars and newsletter was to advertise and sell additional services to OBB's property owners. []*See*[ *id.* at] 60-68….

Additional evidence was produced through OBB's Supplemental Response to [Ms. Duff's] Interrogatories and Request for Production Nos. OUTER 001, OUTER 004[,] and OUTER 007, that showed approximately ten percent (10%) of OBB's managed properties were owned by Pennsylvania residents (*i.e.*, 25-26 Pennsylvania owners out of approximately 250 total properties). In addition, these same documents revealed that[, from] 2020 to 2023[,] three-thousand two[-]hundred and ninety-eight (3,298) of its renters were Pennsylvania residents, which represents over sixteen percent (16%) of its total renters for this period. These same exhibits also revealed that OBB generated fees from the Lazors' property[, from] 2020 to 2023[,] in an amount that exceeded ninety-five thousand dollars ($95,000.00), and if extrapolated for all twenty-five (25) Pennsylvania owners, OBB generated fees that would exceed over two million dollars

---

[13] The full transcript of Mr. Cafferty's deposition is attached as Exhibit A to Ms. Duff's Brief in Opposition to OBB's Preliminary Objections. ***See*** Ms. Duff's Brief in Opposition to OBB's Preliminary Objections, 12/20/23, at Exhibit A ("T. Cafferty Depo.").

($2,000,000.00) from Pennsylvania owners alone, not counting commissions generated from a significant portion of the 3,298 Pennsylvania renters who did not rent from Pennsylvania owners. Based on this evidence, I found that not only did OBB do business in Pennsylvania utilizing its interactive website, emails, and electronic transfers, but also a significant portion of its business derived from Pennsylvania residents[,] both owners and renters.

The rules for general personal jurisdiction allow claims to be brought against non-resident corporations, even if the claims do not relate to Pennsylvania, the forum state, or the defendant's activity in Pennsylvania. [42 Pa.C.S.] § 5301(a)(2)(iii). Although the incident happened in North Carolina, OBB had continuous and systematic business contacts in Pennsylvania using its interactive website, interactive email marketing, and derives a significant amount of its income from its Pennsylvania business, that allow for personal jurisdiction to exist. Thus, I conclude that general jurisdiction exists over OBB.

TCO at 8-10.

On appeal, OBB argues that "Pennsylvania courts have general jurisdiction over a non-resident defendant when the defendant has continuous and systematic contacts with Pennsylvania…." OBB's Brief at 22 (citing *Fidelity Leasing, Inc. v. Limestone Cnty. Bd. Of Educ.*, 758 A.2d 1207, 1210 (Pa. Super. 2000)).[14] OBB says it "is a non-resident corporation with its principal place of business in North Carolina." *Id.* at 25 (citation omitted). It contends that OBB "has never had offices, employees, agents, or representatives in Pennsylvania, has never paid Pennsylvania taxes, and has

---

[14] *See also* OBB's Brief at 24 ("For a Pennsylvania court to have general personal jurisdiction, the defendant must have maintained 'a continuous, substantial, and systematic part of its business within the Commonwealth of Pennsylvania.'") (quoting *Alti, Inc. v. Dallas European*, 2002 WL 31409948 at *2 (Pa. Com. Pl. 2002) (citing *McCall v. Formu-3 Int'l, Inc.*, 650 A.2d 903, 904 (Pa. Super. 1994)).

never used, owned, or possessed property or had any bank accounts or assets in Pennsylvania." *Id.*

With respect to OBB's website, OBB agrees that *Efford* applies here to determine whether Pennsylvania may assert general jurisdiction over OBB based on its website. *Id.* at 25-26. Accordingly, we review *Efford*, a case from 2002.

In *Efford*, horse breeders filed a complaint in equity in Pennsylvania against an association, which publishes written rules that govern the registration of horses in a breed registry, after the association revoked the registration papers of some of the breeders' horses. *Efford*, 796 A.2d at 371. The association — which had offices in New York and Kentucky — filed preliminary objections to the breeders' complaint, which included an objection to personal jurisdiction. *Id.* at 371-72. The trial court found that there was no basis for personal jurisdiction over the association and dismissed the breeders' complaint. *Id.* at 372.

On appeal, the breeders asserted that Pennsylvania had general jurisdiction over the association. *Id.* The breeders advanced that the association had "more than minimum contacts with Pennsylvania in that it actively solicits registration from all thoroughbred breeders world wide via [an] Internet web site and forwards registration forms via mail to breeders and stallion owners." *Id.* at 374. In addressing the question of whether the Internet website of a foreign company permits a Pennsylvania tribunal to exercise personal jurisdiction via Pennsylvania's long-arm statute, which was

an issue of first impression before this Court, we adopted a sliding-scale

approach used by district courts in the United States Court of Appeals for the

Third Circuit:

> The growing case law in the Third Circuit's district courts addressing the relationship between personal jurisdiction and the foreign Internet web sites has established a "sliding scale" of jurisdiction based largely on the degree and type of interactivity on the web site.  In **Zippo Mfg. Co.**[], 952 F.Supp. [at] 1124…, the court stated:
>
>> [T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet.  This sliding scale is consistent with well[-]developed personal jurisdiction principles.  At one end of the spectrum are situations where a defendant clearly does business over the Internet.  If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.  **E.g.**[,] **CompuServe, Inc. v. Patterson**, 89 F.3d 1257 (6th Cir. 1996).  At the opposite end are situations where a defendant has simply posted information on an Internet [w]eb site which is accessible to users in foreign jurisdictions.  A passive [w]eb site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. **E.g. Bensusan Restaurant Corp., v. King**, 937 F.Supp. 295 (S.D.N.Y. 1996).  The middle ground is occupied by interactive [w]eb sites where a user can exchange information with the host computer.  In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the [w]eb site.  **E.g. Maritz, Inc. v. Cybergold, Inc.**, 947 F.Supp. 1328 (E.D.Mo. 1996).
>
> The Third Circuit District Courts have used the "sliding scale" to exercise both general and specific personal jurisdiction.  **See Desktop Technologies, Inc. v. Colorworks Reproduction & Design, Inc.**, 1999 WL 98572 … (E.D.Pa. 1999) (implementing a sliding scale to both general and specific personal jurisdiction);

- 17 -

> ***Molnlycke Health Care AB v. Dumex Medical Surgical Products Ltd.***, 64 F.Supp. 2d 448 ([E.D.Pa.] 1999) (applying the sliding scale to general personal jurisdiction); ***Zippo M***[***fg.***] ***Co.***[, ***supra***] (applying the sliding scale to specific personal jurisdiction). We have compared this "sliding scale" to our principles of personal jurisdiction and find that it is consistent with our well-established concepts of general personal jurisdiction. Therefore, we will use this sliding scale to determine the issue before us.

***Id.***

In applying this sliding scale to the association's website, this Court described:

> [The association's] Internet web site provides information about [it]. It also permits users to register their foals via the Internet. Such a web site falls into the middle ground of the sliding scale. It is not merely passive in that a user can exchange information with the host computer, and it is not a situation where [the association] entered into contracts with residents in Pennsylvania that involve the repeated and knowing transmission of information via the Internet. [The breeders] present evidence that in 1999, 953 foals born in Pennsylvania were registered with [the association], and in 2000, 112 stallions in Pennsylvania were included in [the association's] stallion registry. However, [the breeders] do not assert how many, if any, of these registrations occurred via the Internet. In fact, [the breeders'] registrations that are the subject of this case were registered via the mail. Additionally, there is no evidence in the record that [the association] targeted their web site towards residents of the Commonwealth of Pennsylvania. The web site is available on the Internet and accessible by any person with access to the World Wide Web. [The breeders] did not allege that [the association] "directly mailed" the web site to persons. The web site appears from the record to be general advertising with the added convenience of an on-line registry and was not directed toward any particular state. Therefore, we find that the mere establishment of a web site in which a user may register a horse on-line does not, on its own, suffice to establish general jurisdiction.

> In conclusion, [the association] is a New York corporation with registry offices in Kentucky. It maintains no offices in

- 18 -

Pennsylvania, has no agents or employees in Pennsylvania, does not pay taxes in Pennsylvania, is not registered with the Commonwealth to conduct business in Pennsylvania and does not own or lease property in Pennsylvania. We find that [the association's] maintenance of an Internet web site which permits a Pennsylvania user to register a horse on-line does not suffice to establish general jurisdiction via the long-arm statute.

*Id.* at 374-75 (citation and footnote omitted). As a result, this Court affirmed the trial court's order granting the association's preliminary objections and dismissing the breeders' complaint for lack of personal jurisdiction. *Id.* at 371.

Here, OBB argues that its website "falls in the middle of the sliding scale." OBB's Brief at 27. Among other things, it advances that customers cannot sign contracts on its website; its website does not specifically target Pennsylvanians rather than a national audience; and that the monthly newsletters it sends to its homeowners are informal communications. *See id.* at 27-30.

Problematically, it is unclear to this Court to what extent *Efford's* sliding scale remains suitable to determine general jurisdiction following the United States Supreme Court's decisions in *Daimler* and *Goodyear*, which were decided in 2014 and 2011, respectively. *See Ford*, *supra* (summarizing when a state court may exercise general jurisdiction over a party pursuant to the Due Process Clause and discussing *Daimler* and *Goodyear*). As the Pennsylvania Supreme Court has recounted, and as we touched on *supra*:

In 2011, the High Court explained the limitations of general jurisdiction in *Goodyear*, 564 U.S. at 919, … emphasizing that general jurisdiction is proper only where a corporation's contacts

are "so continuous and systematic as to render [it] essentially at home in the forum [s]tate."

More recently, the [C]ourt further limited general jurisdiction by overtly rejecting the imposition of jurisdiction on defendants based only upon a corporation's "substantial, continuous, and systematic course of business" in a state. *Daimler*, 571 U.S. at 138…. The Court declared that such a broad exercise of general jurisdiction would not allow out-of-state defendants "to structure their primary conduct 'with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id.* at 139… (quoting *Burger King*[,] 471 U.S. [at] 472…). Instead, the Court opined, general personal jurisdiction should be limited to where corporations are headquartered or incorporated. The Court left open the "possibility that in an exceptional case" a corporation could be at home in a forum where it is neither incorporated nor headquartered, if its operations were "so substantial and of such a nature as to render the corporation at home." *Id.* at 139 n.19….[22] It emphasized, however, that merely "continuous and systematic" contacts in the state would not result in the imposition of general personal jurisdiction. *Id.* at 139….

> [22] The example given of an "exceptional case" was *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 … (1952). In that case, the defendant was incorporated and operated mines in the Philippines but ceased its operations there during the Japanese invasion in World War II, during which time the corporation's president managed operations from an office he opened in Ohio. In that unusual situation, the Court found general jurisdiction in Ohio justified because it was the "corporation's principal, if temporary, place of business." *Daimler*, 571 U.S. at 130 … (internal citation omitted).

*Hammons v. Ethicon, Inc.*, 240 A.3d 537, 555-56 (Pa. 2020) (some brackets added).

Thus, to determine whether the exercise of general jurisdiction is permissible under the Due Process Clause, "the inquiry … is not whether a foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic, it is whether that corporation's affiliations with the

[s]tate are so continuous and systematic **as to render [it] essentially at home in the forum [s]tate**." **Daimler**, 571 U.S. at 138-39 (cleaned up; emphasis added); **see also id.** at 137 ("With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction.") (cleaned up); **id.** at 139 n.20 ("General jurisdiction … calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them."); **Goodyear**, 564 U.S. at 924 ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.") (citation omitted).

OBB does not explain what effect **Daimler** and **Goodyear** have on the application of **Efford's** sliding scale in determining general jurisdiction.[15] In fact, OBB fails to mention **Daimler**, **Goodyear**, or their holdings at all in its brief, despite their importance to the issue at hand. Aside from pointing out that OBB is a non-resident corporation with its principal place of business in North Carolina, OBB does not delve into the legal significance of these specific facts in light of binding U.S. Supreme Court precedent, nor does it address where OBB may be deemed 'at home.' **See Daimler**, 571 U.S. at 139 n.19;

---

[15] Following **Goodyear** and **Daimler**, this Court looked to **Efford's** sliding scale for guidance in **Delta Health Techs., LLC v. Companions and Homemakers, Inc.**, 218 A.3d 432 (Pa. Super. 2019). However, specific jurisdiction was at issue in that case, not general jurisdiction. **See id.** at 437 (stating that specific jurisdiction is at issue).

*see also* OBB's Brief at 22 (instead arguing that Pennsylvania courts have general jurisdiction over a non-resident defendant when the defendant has continuous and systematic contacts with Pennsylvania).

We will not raise and develop arguments for OBB. "[I]t is well settled that an appellant bears the burden of sufficiently developing his arguments to facilitate appellate review[,]" and "[o]ur rules of appellate procedure are explicit that the argument contained within a brief must contain such discussion and citation of authorities as are deemed pertinent." ***Commonwealth v. Armolt***, 294 A.3d 364, 376-77 (Pa. 2023) (cleaned up). "It is not the obligation of an appellate court to formulate an appellant's arguments for him." ***Id.*** at 377 (cleaned up). "Indeed, we are neither obliged, nor even particularly equipped, to develop an argument for a party. To do so places the Court in the conflicting roles of advocate and neutral arbiter." ***Id.*** (cleaned up). ***See also Efford***, 796 A.2d at 372 (finding that the appellant's contention that the trial court could exercise specific personal jurisdiction was waived for failure to develop the issue as a legal argument). Further, we decline to address OBB's argument as-is, given that it fails to account for authority that is material to the issue before us. ***See Hammons***, 240 A.3d at 555 (noting that ***Daimler*** "overtly reject[ed] the imposition of jurisdiction on defendants based only upon a corporation's substantial, continuous, and

systematic course of business in a state") (cleaned up).[16]   Accordingly, we deem OBB's argument relating to general jurisdiction waived.

Given our disposition relating to general jurisdiction, we need not address whether Pennsylvania may exercise specific jurisdiction over OBB. We therefore turn to OBB's second issue.

**Second Issue**

*Venue*

In OBB's second issue, it argues that — under the VRA's forum selection clause — the sole proper venue for this action is Dare County.   ***See*** OBB's Brief at 9, 13.   To begin, we recognize that, "[g]enerally, this Court reviews a trial court order sustaining preliminary objections based upon improper venue

_____

[16] If we were to consider OBB's general jurisdiction argument, we would make the following two observations.  First, OBB does not explain why OBB's online activities with the Lazors do not constitute a situation on the sliding scale where "the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet[.]"  ***Efford***, 796 A.2d at 374 (citations omitted).  ***See also*** OBB's Brief at 28-29 (arguing only, with respect to homeowners, that OBB's sending a monthly newsletter is insufficient for establishing personal jurisdiction and that the homeowners agreed to receive such communications); ***but see*** TCO at 8-9 (finding that "OBB's interactive website also contained a homeowner's portal which allowed the homeowner to monitor bookings, place work orders for their properties, and offered webinars that advertised services they could purchase for their property").  Second, we would point out that OBB argues that "[w]hen a defendant's website occupies ***the middle ground***, the court must determine whether the website is 'targeted specifically to Pennsylvanians' and whether it is 'central to the defendant['s] business in Pennsylvania.'"  OBB's Brief at 26 (citing ***Haas***, 952 A.2d at 695; some brackets and emphasis added).  In other words, OBB does not contend that courts must make these determinations when the website falls elsewhere on the spectrum.

- 23 -

for an abuse of discretion or legal error." ***Autochoice Unlimited, Inc. v. Avangard Fin., Inc.***, 9 A.3d 1207, 1211 (Pa. Super. 2010) (citations omitted). However, where the issue involves the interpretation and enforceability of a contract provision, our scope of review is plenary and our standard of review is *de novo*. ***See id.***; ***see also Werner v. 1281 King Assocs., LLC***, No. 1549 EDA 2020, unpublished memorandum at *5-6 (Pa. Super. filed July 16, 2021).[17]

OBB acknowledges that Mr. Kozlina and OBB entered into the VRA pursuant to which Ms. Duff and her family rented the Premises. OBB's Brief at 14; ***see also id.*** at 10 (acknowledging that only Mr. Kozlina signed the VRA). The VRA contains a forum selection clause, which states:

> 25. **Disputes:** This lease shall be governed and interpreted by and in accordance with the laws of the State of North Carolina and shall be treated as though it were executed in the County of Dare, State of North Carolina. Any dispute or action filed relating to this lease shall be instituted and prosecuted in the General Court of Justice within the State of North Carolina and the County of Dare shall be the sole venue for such action. Tenant, by execution of this agreement, specifically consents to such jurisdiction and venue to the extraterritorial service of process should such service become necessary.

OBB's Preliminary Objections at Exhibit A ("VRA") at ¶ 25; ***see also*** OBB's Brief at 14-15 (setting forth forum selection clause).

---

[17] ***See*** Pa.R.A.P. 126(b) (providing that an unpublished non-precedential memorandum decision of the Superior Court filed after May 1, 2019, may be cited for its persuasive value).

- 24 -

Although neither Ms. Duff nor Julian signed the VRA, OBB insists that they are bound by it. **See** OBB's Brief at 19. In support, OBB points to Paragraph 19 in the VRA, stating the following:

> **19. Indemnification and Hold Harmless.** You agree to indemnify and hold harmless the Owner and Agent for any liabilities, theft, damage, cost or expense whatsoever arising from or related to any claim or litigation which may arise out of or in connection with Your use and occupancy of the Premises including but not limited to any claim or liability for personal injury or damage or theft of property which is made, incurred or sustained by You. Neither Agent or Owner are providing any other warranty of any kind, except as otherwise expressly provided herein, whether written or oral, statutory or contractual, express or implied, including, without limitation, THE WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR USE, which are hereby expressly excluded. The terms "Agent" and "Owner" as used in this Agreement shall include their heirs, successors in interest, assigns, employees, agents, and representatives where the context requires or permits. ***The terms "Tenant," "You," and "Your" as used in this Agreement shall include Tenant's heirs, successors, assigns, guests, invitees, representatives and other persons on the Premises during Your occupancy (without regard to whether such persons have authority under the Agreement to be upon the Premises), where the context requires or permits.***

VRA at ¶ 19 (capitalization in original; emphasis added). OBB maintains that "[a]s 'guests,' 'invitees,' and 'other persons on the Premises,' Ms. Duff and [Julian] are bound by this clause." OBB's Brief at 19 (citation omitted); **see also id.** ("Ms. Duff (and [Julian]) are explicitly included with the [VRA's] plain and unambiguous definition of 'Tenant'"). While they did not sign the VRA, OBB argues that:

> Under Pennsylvania law, a contractual forum selection clause can be enforced as to non-signatories to the agreement. **See**[,] **e.g.**, **Kelly v. Bear, Stearns & Co. Inc.**, 2001 WL 1807360 at *2-3

(Pa. Com. Pl. 2001), *aff'd sub nom*[,] **Kelly v. Bear, Stearns & Co.**, 813 A.2d 914 (Pa. Super. [] 2002) [(table)]; [*s*]*ee also* **Radian Guar. Inc. v. Bolen**, 18 F.Supp.3d 635, 645 (E.D.[]Pa. 2014) (applying Pennsylvania law).

Pennsylvania courts similarly enforce arbitration clauses against third parties. **See Johnson v. Pa. Nat'l Ins. Cos.**, 594 A.2d 296, 298-99 (Pa. 1991); **Fish v. Erie Ins. Co.**, 2013 Phila. Ct. Com. Pl. LEXIS 106, No. 3411 (Pa. Com. Pl. 2013). These cases are informative, because arbitration clauses serve a similar function to forum selection clauses: they determine in what "venue" a case must be heard.

*Id.* at 19-20.[18]

In addressing this argument below, the trial court opined:

It is clear on the face of the VRA that [Ms.] Duff was not a party or signatory to the agreement. Specifically, the agreement identifies [Mr. Kozlina] as the "Guest" and OBB as the [a]gent for the owner. The first paragraph of the VRA clearly states that this is a contract solely between [Mr. Kozlina] and OBB as agent for the owner. In addition, by signing the agreement, [Mr. Kozlina] solely promised to abide with all rules and regulations of the VRA. There is no express language in the VRA that gives [Ms.] Duff any rights under the contract or that she was an intended third-party beneficiary. There was no evidence that [Ms.] Duff had any input with renting the vacation home or ever viewed the agreement at any time. Furthermore, there is no evidence that [Ms.] Duff or any other person who stayed or visited the rental property was asked or required to sign the VRA or an addendum in which they agreed to abide by the terms of contract including the forum selection clause. Based on the evidence produced, I conclude that [Ms.] Duff was not a party nor a third-party beneficiary to the VRA, and it was solely between [Mr. Kozlina] and OBB, and

---

[18] Both parties appear to agree that Pennsylvania law applies to determine the enforceability of the forum selection clause on non-signatories; accordingly, we apply Pennsylvania law. **See** OBB's Brief at 19-21 (citing cases applying Pennsylvania law, except for one North Carolina case, **Jarman v. Twiddy and Company of Duck, Inc.**, 889 S.E.2d 488 (N.C. Ct. App.), which had been discussed by the trial court because it contained similar facts to the case *sub judice*); Ms. Duff's Brief at 12-17 (similar).

therefore, [Ms.] Duff was not subject to the forum selection clause.

TCO at 17 (citation omitted).

Upon review, we conclude that no relief is due. Initially, OBB provides no discussion of the cases it cites to support its claim that a forum selection clause can be enforced against non-signatories in its principal brief.[19] Our own review of those cases fails to convince us that relief is warranted.[20] In **_Johnson_** and **_Kelly_**, the non-signatories were determined to be third-party beneficiaries to the contract. **_See Johnson_**, 594 A.2d at 298 ("An injured person who makes a claim for uninsured motorist benefits under a policy to which he is not a signatory is in the category of a third party beneficiary. Historically, this Court has held that third party beneficiaries are bound by the same limitations in the contract as the signatories of that contract."); **_Kelly_**,

_____

[19] OBB also does not address the fact that Julian was a minor at the relevant time. **_See_** Ms. Duff's Brief at 14 (arguing that "Julian was not competent to be bound by any contract, much less by Mr. Kozlina's contract with OBB. … It is axiomatic that a minor child lacks the legal capacity to execute a contract or be bound by its terms").

[20] We were unable to locate **_Fish_**, and therefore cannot consider it in our analysis. **_See_** Pa.R.A.P. 126(a) ("A party citing authority that is not readily available shall attach the authority as an appendix to its filing."). Additionally, we observe that **_Johnson_** is the only case that OBB cites that is binding upon this Court. **_See_** Pa.R.A.P. 126(b), **_supra_**; **_Wilson v. Parker_**, 227 A.3d 343, 356 (Pa. Super. 2020) ("The decisions of the Courts of Common Pleas are not binding precedent; however, they may be considered for their persuasive authority.") (cleaned up); **_Dietz v. Chase Home Fin., LLC_**, 41 A.3d 882, 886 n.3 (Pa. Super. 2012) ("[D]ecisions of the federal district courts … are not binding on Pennsylvania courts…. Nevertheless, these decisions are persuasive authority….") (citation omitted).

2001 WL 1807360, at *3 ("Although the signatories to the [e]ngagement [l]etters were [the] plaintiffs' companies…, it would be illusory to consider that [the] plaintiffs were not third party beneficiaries to the [e]ngagement [l]etters and therefore, vulnerable to the same contractual limitations placed upon their companies."). Here, OBB makes no argument in its principal brief that Ms. Duff or Julian were third-party beneficiaries to the VRA, nor do they examine how someone may become a third-party beneficiary to a contract. It is well-established that "[f]ailure to present or develop an argument in support of a claim causes it to be waived." *Commonwealth v. Thoeun Tha*, 64 A.3d 704, 713 (Pa. Super. 2013) (citation omitted); *see also Commonwealth v. Rush*, 959 A.2d 945, 950-51 (Pa. Super. 2008) ("It [is] not for this Court to develop an appellant's arguments. Rather, it is the appellant's obligation to present developed arguments and, in so doing, apply the relevant law to the facts of the case, persuade us there were errors, and convince us relief is due because of those errors. If an appellant fails to do so, we may find the argument waived.") (citations omitted).[21]

_____

[21] To the extent OBB briefly discusses *Kelly* in its reply brief and summarily claims that "Ms. Duff and [Julian] sought the benefit of the [VRA], pursuant to which they went on vacation[,]" *see* OBB's Reply Brief at 5, we point out that "a reply brief cannot be a vehicle to argue issues raised but inadequately developed in [the] appellant's original brief. When an appellant uses a reply brief to raise new issues or remedy deficient discussions in an initial brief, the appellate court may suppress the non-complying portions." *Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare*, 299 A.3d 937, 969 n.20 (Pa. Super. 2023) (citation omitted); *see also* Pa.R.A.P. 2113(a) (stating that "the appellant may file a brief in reply to matters raised by [the]
*(Footnote Continued Next Page)*

Further, with respect to **Radian**, the federal district court in that case does not appear to apply Pennsylvania law, contrary to OBB's contention. **Radian**, 18 F.Supp.3d at 645-47 (citing federal circuit and district court cases). In addition, **Radian's** applicability is not readily apparent to us. In **Radian**, a former employer sued its former employee and competitors in the United States District Court for the Eastern District of Pennsylvania, alleging that they knowingly violated the employee's non-competition agreement and misappropriated trade secrets and confidential information. **Id.** at 638-40. The non-competition agreement signed by the former employee contained a forum selection clause, agreeing that any legal proceeding arising out of the

_____

appellee's brief or in any *amicus curiae* brief and not previously addressed in [the] appellant's brief").

Even if were to overlook this misuse of the reply brief, we would still consider the argument raised in OBB's reply brief to be lacking in terms of its analysis as to why Ms. Duff and Julian are third-party beneficiaries. Among other things, OBB does not address the trial court's determination that there is no express language in the VRA that gives Ms. Duff any rights under the contract or states that she was an intended third-party beneficiary. **See** TCO at 17. Further, OBB does not acknowledge and consider that, in **Kelly**, the plaintiffs' companies signed the engagement letters containing the forum selection clause to which the plaintiffs were subject, whereas Mr. Kozlina signed the VRA here and there is no evidence that Ms. Duff or Julian viewed the VRA. **Cf. Kelly**, 2001 WL 1807360, at *3 ("The purpose of the [e]ngagement [l]etters was clear. [The p]laintiffs, in hopes of financially benefitting from a potentially lucrative merger, engaged the services of [the defendant]. It is foreseeable that plaintiffs would also be subjected to the forum selection clause within the same [e]ngagement [l]etters from which they were to benefit."). Again, "it is the appellant's obligation to present developed arguments and, in so doing, apply the relevant law to the facts of the case, persuade us there were errors, and convince us relief is due because of those errors." **Rush**, **supra**.

agreement may be brought in the United States District Court for the Eastern District of Pennsylvania. *Id.* at 639. The competitors subsequently tried to have the case dismissed or transferred. *See id.* In response, the district court considered whether the competitors were bound by the forum selection clause where they were non-signatories to the non-competition agreement. *Id.* at 645. The district court observed that, in other federal cases, "close business relationships between the signatories and non-signatories to the pertinent agreements, together with the fact that the dispute among the parties centered on the interpretation of the agreements, provided a sufficient basis on which to apply the forum selection clauses to the non-signatory." *Id.* at 646 (cleaned up). In determining that the forum selection clause should apply to certain competitors named in the lawsuit before it, the district court noted that these competitors sought to employ the former employee while knowing about the non-competition agreement she had signed with her former employer. *Id.* at 647. The district court noted that the former employee had communicated with these competitors repeatedly while still employed by the former employer and sent them a copy of the non-competition agreement, and that these competitors had recognized the risk of hiring a new employee with a non-competition agreement. *Id.* at 646-47. As a result, the district court concluded that these competitors "are sufficiently closely related to [the former employee] so as to foresee being bound by the forum selection clause[.]" *Id.* at 647.

OBB provides no analysis of **Radian** and how it relates to the matter at hand. **See Coulter v. Ramsden**, 94 A.3d 1080, 1088 (Pa. Super. 2014) ("The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority.") (cleaned up). In our view, **Radian** appears distinguishable. Unlike the former employee and the competitors in **Radian**, the case *sub judice* does not involve a 'close business relationship' between the signatory and non-signatories, and there is no evidence that Ms. Duff or Julian viewed the VRA at any time or had any input in renting the Premises. Ms. Duff also suggests that the underlying dispute here does not 'center on' interpreting the VRA in the same way that the dispute in **Radian** centered on interpreting the non-competition agreement. **See** Ms. Duff's Brief at 16 (arguing that "this dispute does not center on interpreting the VRA"). Given OBB's undeveloped argument as to why **Radian** is pertinent, we deem **Radian** inapposite.[22]

---

[22] In addition, to the extent OBB argues that "[v]enue is proper only in a county in which the cause of action arose or where a transaction or occurrence took place out of which the cause of action arose[,]" OBB's Brief at 13 (citation omitted), we deem this claim waived due to OBB's failure to raise it in its statement of questions involved and Rule 1925(b) statement. **See** Pa.R.A.P. 2116(a) ("The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail. … No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the [s]tatement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); Order, 5/15/24 (trial court's warning that "[a]ny issue not properly included in the [s]tatement timely filed and served shall be deemed waived"). OBB's statement of the questions involved and Rule 1925(b) statement
*(Footnote Continued Next Page)*

Based on the foregoing, we conclude that OBB is not entitled to relief on its second issue.[23] Accordingly, we affirm the trial court's order.

Order affirmed.

Judge Lane joins this memorandum.

Judge Olson concurs in the result.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/12/2025

---

challenged only whether venue was improper based on the VRA's forum selection clause. **See** OBB's Brief at 4; Rule 1925(b) Statement, 6/4/24, at 1-2.

[23] Because OBB has not demonstrated the VRA binds Ms. Duff and Julian where they did not sign it, we need not address whether Paragraph 19's definition of 'Tenant' applies to the forum selection clause, and whether Ms. Duff's claims fall within the scope of the forum selection clause.